**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRUCE GAVURNIK**,<br><br>　Plaintiff,<br><br>　*v.*<br><br>**VANTAGE LABS, LLC, et al.**,<br><br>　Defendants. | **CIVIL ACTION**<br><br><br>**NO. 19-5537-KSM** |

## <u>MEMORANDUM</u>

**Marston, J.**                                                     **March 2, 2022**

Plaintiff Bruce Gavurnik has sued Defendants Vantage Labs, LLC and Vantage Learning USA, LLC, alleging that Defendants refused to hire him for a maintenance position because Gavurnik had sued his former employer for violating the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment ("ADEA"). (Doc. No. 1.) Gavurnik asserts retaliation claims under the ADA, the ADEA, and the Pennsylvania Human Relations Act ("PHRA"). (*Id.*) Specifically, Gavurnik claims that Defendants first retaliated against him when they failed to hire him after discovering the lawsuit against his prior employer and then retaliated against him again when they failed to hire him after he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.*)

Defendants have filed a motion for summary judgment, arguing that Gavurnik was unqualified for the position and that he cannot show a causal connection between Defendants' failure to hire him and either his prior lawsuit or his EEOC charge. (Doc. No. 63.) Defendants also contend that Vantage Learning is not a proper Defendant. (*Id.*) Gavurnik opposes the motion. (Doc. No. 64.) The Court held oral argument on February 28, 2022.

For the reasons that follow, Defendants' motion for summary judgment is denied but the

Court dismisses Vantage Learning as a Defendant.

## I.     Factual Background and Procedural History

Taking the facts in the light most favorable to Gavurnik, the relevant facts are as follows.

### A.     *Gavurnik Applies for a Maintenance Technician Position at Vantage Labs*

In March 2017, Gavurnik submitted his resume for a maintenance technician position[1] at

Vantage Labs through the CareerBuilder website.  (Doc. Nos. 63-6, 63-7, 63-8; *see also* Doc.

No. 63-5 at 15:1–16:15, 22:1–4.)  On March 20, CareerBuilder forwarded Gavrunik's resume to

Ashley Secoda, a recruiter for Vantage Communications.  (Doc. No. 63-6; Doc. No. 64-4 at

9:17–10:5, 11:12–15, 14:4–24 (explaining the process for when a position is posted on

CareerBuilder: "the job is posted, an applicant applies and a notification with the application is

sent to the recruiter or whoever opened the position").)

As a general matter, once Secoda received a candidate's resume, she "would compare

their background to whatever the open job posting was.  If it appeared that they met minimum

qualifications, then [she] would schedule a call.  If they didn't, then they would typically be

rejected."  (Doc. No. 63-5 at 41:9–19; *see also id.* at 42:5–6 ("Based on the resume review, we

---

[1] The job posting states that "Vantage Labs [was] seeking an experienced Maintenance Technician" and that person would be "responsible for building maintenance, custodial, grounds-keeping tasks and general maintenance in all locations."  (Doc. No. 63-8.)  The maintenance technician would be responsible for plumbing, carpentry, electrical, carpentry, warehouse, and HVAC work, among other things.  (*Id.*)  The qualifications included, *inter alia*, the ability to be on call as the primary point of contact and first responder, 24/7 in case any issues should arise," the "ability to work extended hours, after hours, weekends and in emergency situations," the "ability to carry out instructions," and "general knowledge & experience in Building maintenance."  (*Id.*)

According to Peter Murphy, the founder of Vantage Labs and Vantage Learning, however, he interviewed Gavurnik for a maintenance *manager* position.  (*See* Doc. No. 63-16 at 29:7–34:17 (stating that the manager would be given the ability to hire one other maintenance person and that above all, a maintenance manager must "be truthful and trustworthy, since he [would have] the keys to pretty valuable assets").)

would have had a phone screen.").)  Then, "if the phone screen went well," Secoda would gather additional details and "move forward to an interview."  (*Id.* at 42:6–12.)

Because Secoda determined, based on Gavurnik's resume, that he met "the minimal qualifications" for the maintenance technician position, she scheduled a "phone screen."  (*Id.* at 22:1–4, 25:4–21, 41:20–42:12.)  During the phone screen, Gavurnik indicated that he was currently unemployed, that he did not have any restrictions on the types of hours he could work in a typical day, and that he had experience with being on call.  (*See* Doc. No. 63-9; Doc. No. 64-4 at 23:4–21.)  Gavurnik also stated that he was skilled at plumbing, electrical work, and carpentry; in addition, he had experience doing basic HVAC maintenance, but he was not licensed.  (Doc. No. 63-9.)

### B.   Gavurnik Interviews with Kerry Murphy and Linda Knoblauch and Takes the Wonderlic Test

On March 20, after the phone screen, Secoda arranged for Gavurnik to be interviewed by Kerry Murphy,[2] the Project Manager for Maintenance/Construction and Vice President of Real Property of Vantage Labs, and Linda Knoblauch, the Office Manager of Vantage Labs, two days later on March 22.  (Doc. No. 64-4 at 22:14–23:3; Doc. No. 63-3, Response to Interrog. 8; Doc. No. 64-10 at 8:2–3.)  On March 21, Gavurnik completed an Application for Employment with Vantage Labs.  (*See* Doc. No. 63-10.)

In his application, Gavurnik indicated that he had received his high school diploma.[3]  (*Id.*

---

[2] Kerry Murphy is the spouse of Peter Murphy, founder of Vantage Labs and Vantage Learning.  (Doc. No. 63-16 at 25:2–3.)

[3] The resume Gavurnik submitted through CareerBuilder also states that he attained his high school diploma.  (*See* Doc. No. 63-7.)  However, during his deposition, Gavurnik admitted that he never graduated high school, nor did he receive his GED, and therefore he does not have a high school diploma. (Doc. No. 63-17 at 15:24–16:7.)

at pp. 1, 7.)  As for his employment history, Gavurnik stated that he worked as a maintenance technician at InterSolutions from March 2014 to March 2017 and indicated that he was no longer employed there because he had resigned.  (Doc. No. 63-10 at p. 4.)  Before InterSolutions, Gavurnik worked as a maintenance technician for Home Properties from 2013 to 2014 when he was let go.  (*Id.*)  Prior to that, Gavurnik worked as a maintenance technician for Eastern Property Group at one of the properties it owned, Chalet Village.  (*Id.*; Doc. No. 63-17 at 123:15–21.)

As for references,[4] Gavurnik listed John Whelihan, a friend who he worked with at the Racquet Club, while working for Home Properties; Paul Stephans, a friend from high school; Ed Deputy, another friend[5]; and Kurri Slavin, a property manager at Chalet Village.  (*Id.* at p. 3; Doc. No. 63-17 at 121:19–123:12.)  Of these four individuals, Slavin was the only individual who ever supervised Gavrunik.  (*See* Doc. No. 63-17 at 121:19–123:12, 125:22–126:1.)

The day of the interview, Daniel Filson, a corporate recruiter for Vantage Learning, greeted Gavurnik and administered the Wonderlic Contemporary Cognitive Ability Test (WPT-R) (the "Wonderlic").[6]  (Doc. No. 63-14; Doc. No. 63-13 at 7:24–8:10, 12:22–14:14.)  The

---

[4] The Employment References section of the application stated: "Please provide additional references of individuals who are in a position to evaluate your past and current job performance, attitude, attendance, and quality of work.  ***Please do not include relatives or personal acquaintances***."  (Doc. No. 63-10 at p. 3.)

[5] Gavurnik testified that he and Deputy were not coworkers and there was no employment relationship between them.  Rather, Gavurnik met Deputy while he was working at Chalet Village, but that "had nothing to do with working for them.  He just lived there at Chalet Village."  (Doc. No. 63-17 at 122:7–19.)

[6] Filson testified that the specific Wonderlic test that Gavurnik took, the WPT-R, tests the cognitive ability of the candidate.  (Doc. No. 63-13 at 17:1–7; *see also* Doc. No. 64-5 at 15:13–17 (stating that the Wonderlic is a "mixture of personality and assessment")．)  Kerry Murphy testified that the Wonderlic tests a candidate's skill level, though she did "not know much about it."  (Doc. No. 63-15 at 20:22–23.)  Peter Murphy testified that the Wonderlic tests "somebody's ability to problem-solve."  (Doc. No. 63-16 at 57:15–19.)  Secoda testified that the Wonderlic was a "personality based assessment."  (Doc. No. 64-4

Wonderlic is administered to all applicants, regardless of job title or position, and to be a "strong fit" to work at the company, an applicant should score in the 27 to 31 range.  (Doc. No. 63-13 at 21:1–22; Doc. No. 64-5 at 15:9–17 (stating that the Wonderlic is a "mixture of personality and assessment" and that Vantage administers it to everybody who applies for a job "to make sure they are a good fit within our company").)  Gavurnik scored an 11 on the Wonderlic, which indicated that he was a "weak fit."  (Doc. No. 63-14 (showing that Gavurnick had an IQ equivalent to 81 and scored in the 11th percentile in the population); *see also* Doc. No. 63-16 at 57:20–24 ("Q: So when you see a score of 11, what does that mean to you?  A [Peter Murphy]: What does it mean to me?  It means that it was the worst score of anybody that I have interviewed in my career.").[7] According to Gavurnik, Filson told him that he "aced" the Wonderlic.[8]  (Doc. No. 63-17 at 135:6–136:19; Doc. No. 63-21.)

Afterwards, Filson escorted Gavurnik to his interview with Kerry Murphy and Knoblauch.  (*See* Doc. No. 63-17 at 136:21–137:6.)  Kerry Murphy recalled that Gavurnik "had minimal skills."  However, because they "were having difficulty finding maintenance people," she thought "he was possibly the stop gap measure," i.e., they could hire Gavurnik while they waited to see if they "could find somebody who had the skill set [they] need."  (Doc. No. 63-15 at 20:1–10.)  Kerry Murphy testified that she told Filson that she would speak to her husband, Peter Murphy, the founder of Vantage Labs and Vantage Learning, about moving forward, given

---

at 34:1–5.)

[7] Peter Murphy testified that to offset or overcome a score of 11, Gavurnik would have to had shown demonstrated skill with finish carpentry, references from employers about that kind of skill, and demonstrations of "truthfulness, trustworthiness . . . loyalty, [and] industriousness."  (Doc. No. 63-16 at 58:9–59:7; *see also id.* at 59:11–13 (stating that an employee must be "loyal to the job, the work, goal-oriented"), *id.* at 74:9–10 ("For this position, trust, trustworthiness were important.").)

[8] Gavurnik claims that he was also told that he "aced" his interview with Kerry Murphy and Knoblauch.  (*See* Doc. No. 23-21.)

that he "is the one who hires everyone."[9]  (*Id.* at 20:11–21:6, 22:9–15.)  Even though Kerry Murphy oversaw the maintenance of all of Vantage Labs's facilities and maintenance employees reported to her, she has "no responsibility" with respect to hiring them.  (*Id.* at 21:14–16, 22:9–18; Doc. No. 64-10 at 8:5–13; *cf.* Doc. No. 63-16 at 29:14–18 (Peter Murphy's testimony that he interviewed Gavurnik because "he would have been reporting to Kerry and she reported to me"); Doc. No. 64-6 at 14:10–18 (same); Doc. No. 63-5 at 28:19–20, 29:3–15 (Secoda's testimony that offer letters had to be approved by Peter Murphy and Brian Gibney but not Kerry Murphy).)  According to Kerry Murphy, she told her husband that although Gavurnik did "not meet our skill set," "he might be okay . . . as a stop gap measure."  (Doc. No. 63-15 at 23:2–10.)  In addition, because she "wasn't sure what [Gavurnik's] abilities were," she told Peter Murphy that he should meet him.[10]  (*Id.*)

Following Gavurnik's interview with Kerry Murphy and Knoblauch, Filson followed up with Secoda in an email stating:  "FYI.  I have Bruce's application.  Linda & Kerry[11] would like to get an offer letter[12] set up for Bruce.  They really enjoyed speaking with him (they'll likely

---

[9] Kerry Murphy also indicated that she would talk to Peter Murphy about a $21 per hour salary for Gavurnik.  (*See* Doc. No. 64-11 ("Kerry mentioned she'll be speaking with Pete about the $21 pay range.").)

[10] Peter Murphy testified that his wife, Kerry Murphy, gave him the impression that she was uncertain about Gavurnik's skill set and that because the role had been "open for a while," she was "uncertain as to what to do."  (Doc. No. 63-16 at 43:12–44:7.)

[11] Kerry Murphy testified that she did not tell Filson that she wanted to set up an offer letter for Gavurnik.  (*See* Doc. No. 63-15 at 23:17–20 ("I couldn't, because I'm not the person who sets up an offer letter.").)

[12] Secoda testified that the email indicated that they "want[ed] [her] to start the offer letter process."  The company had a template, and Secoda would "fill[] in the missing information," such as the "candidate['s] personal information, salary, [and] start date."  From there, she "would have sent it to Linda and Kerry," and then the letter would go to Brian Gibney, the Director of Human Resources, and Peter Murphy for approval as "the final step."  (Doc. No. 63-5 at 28:4–24.)  Gibney and Peter Murphy had final say over hiring decisions and all offer letters had to be approved by them.  (Doc. No. 63-5 at 29:3–15; Doc. No. 63-3, Response to Interrog. 8; *see also* Doc. No. 64-6 at 16:3–12 (Peter Murphy's testimony that "[he]

follow up with you)."  (Doc. No. 64-11.)  Secoda does not recall whether she ever put an offer

letter together for Gavurnik.  (Doc. No. 63-5 at 30:1–6.)

> **C.**    ***Gavurnik Advances in the Process and Has an Interview with Peter***
> ***Murphy, Founder of Vantage Labs and Vantage Learning***

On March 23, Secoda scheduled the next round in the interview process—Peter

Murphy's interview of Gavurnik—which took place the following day, March 24.  (Doc. No. 64-

4 at 32:7–16; Doc. No. 64-14.)

Gavurnik did not recall much of their conversation (e.g., what the requirements of the job

entailed, whether he told Peter Murphy he was collecting unemployment, whether Peter Murphy

asked for a reference for his supervisors at Home Properties or InterSolutions, whether he

provided those references, etc.).  (*See* Doc. No. 63-17 at 171:1–23, 172:19–173:9; Doc. No. 64-

13 at 170:3–171:4, 174:6–10, 175:1–4.)  However, Gavurnik recalled that they discussed the

issues he had with the "work requirements" at Home Properties, including "problems with 80, 90

hour weeks" (Doc. No. 63:17 at 171:24–172:9), and they discussed that Home Properties

terminated him and his lawsuit against Home Properties (Doc. No. 64-13 at 174:4–6, 175:5–8).

According to Gavurnik, the subject of the lawsuit came up when Peter Murphy "got up and

walked over . . . and put the phone into my face close enough for me to read it and asked if that

was me for a lawsuit."  (*Id.* at 175:9–14; *see also* Doc. No. 63-21 ("During the interview Pete

Murphy questioned me about a lawsuit that I currently have pending against an employer for age

and disability discrimination.  He 'googled' my name during the interview and then showed me

my pending lawsuit on his phone as he held it up to my face.  Among the numerous questions

were 'Why did you do it?' and 'Would you do it again?'").)

_____

can always say no").)

During the interview, Gavurnik handed Peter Murphy a copy of his resume, which was "completely" different from the resume he submitted on CareerBuilder. (*See* Doc. No. 63-17 at 164:2–16; *see also* Doc. No. 64-13 at 166:16–167:5, 168:8–19 (stating that he handed Peter Murphy his "old resume").) Peter Murphy took handwritten notes on it. (*See* Doc. No. 63-20 at pp. 5–8 (Peter Murphy's handwritten notes); Doc. No. 64-13 at 168:20–23 (Gavurnik's testimony that he did not notice Peter Murphy writing or taking notes); Doc. No. 63-16 at 66:21–22.) The resume only listed Gavurnik's employment up until 2012, and Peter Murphy wrote "resume incomp[lete]" and "last 4+ yrs [years] missing?" (*Id.* at p. 5.) When they discussed the jobs that were missing from that version of Gavurnik's resume—InterSolutions and Home Properties—Peter Murphy believed that Gavurnik was lying because, according to him, at one point Gavurnik indicated that he went on unemployment after leaving InterSolutions but at another point he indicated that he resigned from his position there. (*See* Doc. No. 63-20 at p. 11 ("Went on Unemployment – Either Lying @ Resignation – Or Unemployment."); *see also* Doc. No. 63-16 at 74:13–17 ("Somebody lying about the reasons why they were no longer employed is not a condition, a positive condition for employment. Somebody saying that they resigned a position and then subsequently saying that they're on Unemployment does not, you know, create a condition for being hired by one of our companies.").) As for Home Properties, Peter Murphy wrote "Refused Boss Reference Already Prov,"[13] "Let Go – Lack of Work," "Figured If They Let Him Go They Would Be Sympathetic," "Snow – OT – Did Not Like." (Doc. No. 63-20 at p. 11.)

---

[13] Peter Murphy testified that when he questioned Gavurnik about references for his employers, Gavurnik would refer him back to the references had already provided, which Peter Murphy believed were insufficient because they were "largely friends" and not employers—in other words, "nobody that could really vouch for his demonstrated . . . skills." (Doc. No. 63-16 at 63:7–22.)

Peter Murphy also wrote that Gavurnik attended high school in Warren Township, New Jersey but was "sketchy on graduation." (*Id.* at p. 1.) Peter Murphy's notes also state that Gavurnik had a "Bad WL [Wonderlic]" and was "desperate, angry, not a manager . . . lied @ REFS [references], [and had] no ref[erence] on 24/7 [being on call 24/7]." (*Id.*) Peter Murphy also wrote, "Why Did You Lie? - Bad Refs, - Waste of Time, - Coerced, and - Never Do It Again." (*Id.* at p. 7.)

Ultimately, Peter Murphy testified that Gavurnik's interview was "one of the worst . . . [he] ever had in [his] career" and that "he provided a lot of negative information to contemplate." (Doc. No. 63-16 at 74:6–8; Doc. No. 64-6 at 75:1–2.) However, Peter Murphy did not tell Gavurnik that he was not getting the job, nor could he say whether he made up his mind not to hire Gavurnik during the interview. (Doc. No. 64-6 at 75:3–9 ("I just don't know that I had made up my mind."), 75:16–18.)

Afterwards, Defendants continued to receive applications and interview candidates for the maintenance technician opening.[14] (*See* Doc. No. 64-8 (James Lehner's resume for the maintenance technician position, submitted on April 2, 2017); Doc. No. 64-17 (Christopher Marshall's application for a maintenance technician position for Vantage Learning, dated April 10, 2017); Doc. No. 64-12 at p. 4 ("After interviewing Mr. Gavurnik, Vantage Labs continued its interview process and interviewed an additional three candidates."); *see also* Doc. No. 64-9 (June 2, 2017 email confirming interview with Louis Donatucci); Doc. No. 63-20 at p. 15 (Louis Donatucci's May 23, 2017 Wonderlic test results; he scored a 29, indicating that he was a

---

[14] Louis Donatucci, who was ultimately interviewed and hired in June 2017 for the maintenance technician position, originally submitted his resume for a General Maintenance Contractor position on January 30, 2017. (*See* Doc. No. 63-11.) According to his offer letter, he would earn an annual salary of $65,000 in the maintenance technician role. (Doc. No. 64-18.)

"strong fit"); Doc. No. 64-18 (formal offer letter sent to Louis Donatucci, offering him

"employment with Vantage Labs as a Maintenance Technician," dated June 27, 2017).)

>    **D.**   ***Gavurnik Does Not Hear Back from Vantage Labs After His Interview and Files an EEOC Charge***

On March 29, five days after Gavurnik interviewed with Peter Murphy, Gavurnik

followed up with Secoda, inquiring about the status of his application.  (Doc. No. 63-21 at p. 2.)

He did not receive a response.  (*Id.*)  Subsequently, on May 8, Gavurnik filed a Charge of

Discrimination with the EEOC, claiming that Defendants retaliated against him by failing to hire

him after questioning him about his pending ADEA and ADA lawsuit.  (*See id.* at pp. 1–2

(Charge No. 530-2017-02582).)

On October 25, Vantage Labs filed its position statement with the EEOC.  (*See* Doc. No.

64-12.)  It represented that it continued to interview candidates after Gavurnik's March 24

interview.  (*Id.* at p. 4.)  Vantage Labs stated:

> **[N]o decision to hire or reject any of the interviewed candidates was made until after the last candidate for the advertised position was interviewed on May 22, 2017**.  At the time of the filing of Mr. Gavurnik's Charge of Discrimination, Vantage Labs had not made any decision regarding his application and was still interviewing other candidates.  The advertised position was only filled after Mr. Gavurnik filed his Charge of Discrimination.

(*Id.*)  Further, Vantage Labs asserted that in any event, "a decision not to select Mr. Gavurnik

would have been warranted [because he] scored significantly below [the] acceptable range of

ability on the critical cognitive ability test."  (*Id.*; *see also id.* at p. 5 ("Mr. Gavurnik's score . . .

is in fact tied with a previous candidate that was rejected as the lowest score received from all

candidates taking this assessment in 2017 and is the second lowest score of any candidates taking

the Wonderlic Cognitive Ability Test since 2014.").)  Vantage Labs also claimed that it had

another legitimate reason for not hiring Gavurnik, had it made a decision prior to Gavurnik's

filing of the Charge:  the dishonesty he exhibited during his interview when he lied about his

prior work history.  (*Id.* at pp. 5–6.)

### E.   *Gavurnik Files a Second EEOC Charge*

On January 26, 2018, Gavurnik filed a second EEOC Charge of Discrimination.  (*See*

Doc. No. 63-21 at p. 3 (Charge No. 530-2018-02563).)  In that Charge, Gavurnik alleged that

Defendants retaliated against him by failing to hire him after he filed his first EEOC Charge.  (*Id.*

at p. 3 ("Respondents' failure to hire me, or even consider me for employment, after receipt of

Charge No. 530-2017-02582 constitutes unlawful retaliation in violation of [the ADA and the

ADEA]").)

\*      \*      \*

On September 20, 2019, the EEOC issued Gavurnik a Right to Sue letter for Charge No.

530-2017-02582, and shortly thereafter, on September 25, the EEOC issued Gavurnik a second

Right to Sue letter, this time for Charge No. 530-2018-02563.  (*See* Doc. No. 1 at pp. 13, 15.)

Two months later, on November 22, 2019, Gavurnik initiated this lawsuit.  (*See generally* Doc.

No. 1.)  Following this Court's ruling on Defendants' motion to dismiss and motion for a more

definite statement (*see* Doc. No. 18), Gavurnik filed an amended complaint (Doc. No. 20).

Presently before the Court is Defendants' motion for summary judgment.  (Doc. No. 63.)

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict

for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under

the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element

essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury.  *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.    Discussion

Defendants argue that Gavurnik's retaliation claim must fail because he cannot state a prima facie case of retaliation because he was unqualified for the position and cannot show a causal connection between his protected activities and Defendants' failure to hire him.  (Doc. No. 63.)  Defendants also assert that Vantage Learning is not a proper party.  (*Id.*)  Gavurnik disagrees and contends that he has raised genuine disputes of material fact to survive

Defendants' summary judgment motion and that Defendants' alleged non-retaliatory reasons for not hiring him were pretextual.  (*See* Doc. No. 64.)  Gavurnik also asserts that Vantage Learning was properly named as a Defendant.  (*Id.*)

The Court addresses the parties' arguments in turn below.[15]

### A.    *Retaliation*

Gavurnik claims that Defendants retaliated against him twice:  first, when Defendants failed to hire him because he had sued his prior employer for violations of the ADA and ADEA, and second, when Defendants failed to hire him, or consider him for the maintenance position, because he filed an EEOC charge against Defendants.  (Doc. No. 20 at pp. 6–8 (Counts I, II, & III).)

Gavurnik brings parallel claims under the ADA, the ADEA, and the PHRA.  (*See id.*)  The ADA's retaliation provision prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted or participated in any manner in . . . [a] proceeding . . . under [the ADA]."  42 U.S.C. § 12203(a).  Similarly, the ADEA makes it unlawful for employers to "discriminate against any of [its] employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an

---

[15] The Court is disappointed in the briefing submitted by both parties in this case.  Both parties present conclusory generalizations and fail to cite to relevant case law.  And neither party's brief conforms with the Court's Policies and Procedures.  (*See* Judge Marston's Policies & Procedures, Section II.B. ("Every factual assertion considered by the submitting party to be important to that party's position in a motion, opposing papers or *brief* must be supported by citation or other specific reference to the record where the fact may be found . . . [R]ecord citations must be pinpoint cites." (emphasis added)).)  The parties are warned that in the future blatant disregard of the Court's policies and procedures will result in the Court striking the pleadings.

investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). And, finally, the PHRA has a nearly identical provision. *Sterling v. McKesson Automation, Inc.*, No. 02:04cv1470, 2006 WL 2702203, at *9 (W.D. Pa. Sept. 26, 2006); *see also* 42 Pa. C.S. § 955(d) ("It shall be an unlawful discriminatory practice . . . for any . . . employer . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any . . . proceeding . . . under this act.").

Because the same legal standards apply to the ADA, the ADEA, and the PHRA, the Court considers Gavurnik's three retaliation claims together. *See, e.g.*, *Sterling v. McKesson Automation, Inc.*, No. 02:04cv1470, 2006 WL 2702203, at *9 (W.D. Pa. Sept. 26, 2006) ("Retaliation claims under the ADEA, ADA, and PHRA are analyzed in the same manner as retaliation claims under Title VII." (collecting cases)).

The *McDonnell Douglas* burden shifting framework governs Gavurnik's retaliation claims. *See, e.g.*, *Stouch v. Township of Irvington*, 354 F. App'x 660, 667 (3d Cir. 2009) ("The *McDonnell Douglas* burden-shifting framework also applies to ADA retaliation claims."); *Dreibelbis v. County of Berks*, 438 F. Supp. 3d 304, 313 (E.D. Pa. 2020) ("It is well recognized that the burden-shifting framework of *McDonnell Douglas* applies to ADA claims[.]"). First, Gavurnik must state a prima facie case of retaliation, after which the burden shifts to Defendants to articulate legitimate, non-retaliatory reasons for their actions. Then, the burden shifts back to Gavurnik to show that the stated reasons are pretextual. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

### i. *Prima Facie Case*

To establish a prima facie cause of retaliation, Gavurnik must show that he (1) engaged in

protected activity; (2) Defendants took an adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Stouch*, 354 F. App'x at 667; *Sterling*, 2006 WL 2792203, at *9. "Where, as here, the plaintiff claims that the retaliation took the form of a failure to hire, the plaintiff must also show: (4) that he applied for an available job; and (5) that he was qualified for that position." *Rocco v. Gordon Food Serv.*, Civil No. 16-1290, 2017 WL 1355434, at *7 (W.D. Pa. Apr. 13, 2017) (quoting *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003); *see also Morgan*, 328 F.3d at 654 ("Because Morgan thus provided no evidence that he met a bona fide qualification for the Business Strategies position, he failed to establish a prima facie case of . . . retaliation, and summary judgment was again appropriate."); *Zahradnik v. Valley View Sch. Dist.*, Civil Action No. 3:16-1988, 2019 WL 1424731, at *4 (M.D. Pa. Mar. 30, 2019) ("[S]everal [federal district] courts in our state have said that when a plaintiff claims retaliation in the form of failure to hire, the plaintiff must also show that (4) they applied for an available job; and (5) they were qualified for the position"); *Bartlett v. Kutztown Univ.*, Civil Action No. 13-4331, 2015 WL 766000, at *10 (E.D. Pa. Feb. 23, 2015) ("With specific regard to retaliation in the form of a failure to hire/re-hire, the plaintiff must also show: 4) that [he] applied for an available job; and 5) that [he] was qualified for that position.").

Here, it is undisputed that Gavurnik engaged in protected activity on two different occasions:  first, when he sued his former employer, Home Properties, for discriminating against him on the basis of his disability and age, in violation of the ADA and ADEA, and second, when he filed a charge with the EEOC after he interviewed with Defendants and they failed to follow up with him.  It is also undisputed that the maintenance technician job was open and available and that Gavurnik was not hired for the position.

15

Therefore, the only issues for the Court to consider are whether Gavurnik was qualified for the position, and whether Gavurnik can demonstrate a causal connection between either of his protected activities and Defendants' determination not to hire him.  We address each in turn.

### *Qualification*

Viewing the facts in the light most favorable to Gavurnik, the Court finds that Gavurnik has raised a genuine dispute of material fact as to whether he was qualified for the maintenance technician position.  Specifically, Secoda testified that Gavurnik would not have progressed past the phone screen had he not met the minimal qualifications for the job.  (*See* Doc. No. 63-5 at 41:9–19, 41:20–42:12.)  Moreover, a reasonable juror could infer from Filson's March 22 email to Secoda—in which he states that "Linda & Kerry would like to get an offer letter set up for Bruce" (Doc. No. 64-11)—that Gavurnik was qualified for the position.  In addition, a reasonable juror could infer from Kerry Murphy's testimony that Gavurnik could be used as a "stop gap measure" that he had adequate qualifications for the role.  (*See* Doc. No. 63-15 at 20:1–10.)

In so ruling, the Court acknowledges that the record certainly raises questions as to Gavurnik's qualifications—in particular, his low Wonderlic score, Kerry Murphy's testimony that she doubted Gavurnik had the adequate skillset for the position, and the lack of adequate prior employment references, among other things.  However, at this stage, the Court must view the facts in the light most favorable to Gavurnik.  As a result, given Secoda's testimony, the "stop gap measure" testimony, and the March 22 email about setting up an offer letter, the Court concludes that a genuine dispute of material fact exists as to whether Gavurnik was qualified.

### *Causation*

Having found that Gavurnik raises a genuine issue of material fact as to whether he was

qualified, we now consider whether Gavurnik has established a causal nexus between his protected activities and Defendants' failure to hire him. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted). Other evidence may also support a causal link. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference. . . . Moreover, we have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider.").

In arguing that Gavurnik has failed to state a prima facie case of retaliation, Defendants fail to cite a *single* case that supports its entirely conclusory position that Gavurnik "cannot demonstrate a causal connection between the knowledge of his pending lawsuit against his prior employer as a retaliatory reason for his not being hired by Defendant, Vantage Labs." (*See* Doc. No. 63 at p. 1.)[16]

---

[16] Indeed, the only three cases that Defendants cite in the *entirety* of their legal analysis are completely inapposite. (*See* Doc. No. 63 at pp. 11–16.) First, Defendants cite to *Shub v. Westchester Community College* for the proposition that they have "unfettered discretion to choose among qualified candidates." (*Id.* (quoting *Shub*, 556 F. Supp. 2d 227, 252 (S.D.N.Y. 2008)).) But Defendants cherry-picked that quote from the court's analysis a *First Amendment* claim—*not* an ADA, ADEA, or PHRA retaliation claim. *See Shub*, 556 F. Supp. 2d at 252. Second, Defendants cite to *Williams v. Philadelphia Housing Authority Police Department* to outline the elements of a prima facie case of retaliation and, *without any explanation*, to support its conclusory statement Gavurnik cannot establish causation. (Doc. No. 63 at pp. 11, 14 (citing *Williams*, 380 F.3d 751 (3d Cir. 2004)).) But *Williams* was not a failure-to-hire retaliation case and therefore is factually distinguishable and, without more, does not assist us in determining whether Gavurnik has established causation here. *See Williams*, 380 F.3d at 760. Third, Defendants cite to *Wanamaker v. Columbian Rope Co.* for the sole purpose of listing the elements of a prima facie case of retaliation. (*See* Doc. No. 63 at p. 15 (citing *Wanamaker*, 108 F.3d 462, 465 (2d Cir. 1997)).) But

Ultimately, given Defendants' complete lack of analysis as to causation, the Court cannot conclude that Defendants have met *their burden* of showing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.  And, even if they had, the Court finds that Gavurnik has raised a genuine issue of material fact as to whether his first protected activity—filing a lawsuit against Home Properties for violations of the ADA and ADEA—caused Defendants not to hire him.  Viewing the facts in the light most favorable to Gavurnik and drawing all inferences in his favor, Secoda was instructed to prepare an offer letter for Gavurnik *before* Peter Murphy interviewed him (and became aware of the lawsuit) and *after* the Wonderlic test had been scored.  (*See* Doc. No. 64-11.)  In addition, Gavurnik testified that it had been an "extremely friendly" interview up until the point when Peter Murphy brought up Gavurnik's Home Properties lawsuit.  (Doc. No. 64-13 at 175:5–20.)  Further, Peter Murphy testified that he did not know whether he decided not to hire Gavurnik during the interview—in other words, a reasonable juror could infer that Peter Murphy *did* decide not to hire Gavurnik at some point during the interview.  (*See* Doc. No. 63-6 at 74:3–9 ("Q: At some point during the interview, did you make up your mind that you weren't going to offer him the position?  A: He had a very bad interview; I'll say one of the worst interviews I had in my career.  So where that leaves somebody in my position, I don't – I don't know."); Doc. No. 75:3–9 ("Q: So is the answer no, you didn't make up your mind during the interview?  A: I – I can't say I can answer that question.  Q: Why?  A: I just don't know that I had made up my mind.").)  This testimony also ties into Peter Murphy's credibility; although the Court may not make credibility determinations at this stage, a jury could choose to disbelieve Peter Murphy's testimony that he

---

*Wanamaker* is of no use to Defendants here, as the court found that the plaintiff failed to show that he suffered an adverse employment action and did not address causation.

did not make up his mind during the interview.

### ii.    *Legitimate, Nonretaliatory Reason and Pretext*

Since Gavurnik has met his burden of establishing a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, nonretaliatory reason for refusing to hire Gavurnik.  Defendants have done so here:  they contend that (1) before interviewing additional candidates, they had not yet made up their mind as to whether to hire Gavurnik for the role, and (2) Gavurnik had a minimal skillset and that they wanted to hire someone more qualified for the role.  Therefore, Gavurnik must show that Defendants' stated reasons were merely pretextual.

To show pretext, a plaintiff must submit evidence which "(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that the factfinder could reasonably conclude that each reason was a fabrication, or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Young v. Pennsauken Twp. Sch. Dist.*, 47 F. App'x 160, 162 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)); *see also Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 702 (E.D. Pa. 2016) ("To establish pretext, [the plaintiff] must proffer evidence that her employer's reason for terminating her is unbelievable or implausible, or evidence that her engaging in protected activity was more likely than not the motivating cause of Defendants' decision to terminate her.").  A non-moving party can show pretext "by exposing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007) (cleaned up).

Although Defendants are the moving party, they have failed to address pretext in their

briefing.  Thus, the Court cannot find that Defendants have met their burden and are entitled to judgment as a matter of law.  And even if they had, the Court finds that Gavurnik has raised a genuine issue of material fact as to whether Defendants' stated reasons were pretextual.  As noted, Secoda was instructed to prepare an offer letter for Gavurnik *before* Peter Murphy interviewed him (and learned about his lawsuit) and *after* the Wonderlic test had been scored.  (*See* Doc. No. 64-11.)  Therefore, Defendants' contention that Gavurnik was unqualified for the job because he scored poorly on the Wonderlic rings hollow and is inconsistent with its own actions—i.e., bringing Gavurnik in for an interview with its CEO and founder *after* receiving his low score.  That Secoda believed Gavurnik possessed the minimal qualifications to advance beyond the screen and that Kerry Murphy thought that Gavurnik could possibly work as a "stop gap measure" also undermine Defendants' position that Gavurnik was entirely unqualified.  Further, a reasonable juror could find that there are weaknesses in Defendants' assertion that Vantage Labs had not made any hiring decisions until after Gavurnik submitted his first EEOC Charge.  In particular, viewing the facts in the light most favorable to Gavurnik, as noted above, a reasonable juror could infer from Peter Murphy's testimony that he *did* make up his mind during the interview that he would not hire Gavurnik.  (*See* Doc. No. 63-6 at 74:3–9; Doc. No. 75:3–9.)  Last, the individual that Vantage Labs ultimately hired for the maintenance position role, Louis Donatucci, had submitted his resume in January 2017 for a *different* position (general maintenance contractor), months before Gavurnik ever applied for, or was interviewed, for the maintenance technician role, and was ultimately offered a salary of $65,000 (which was far greater than the $21 per hour salary Gavurnik was seeking).

Accordingly, the Court denies Defendants' motion for summary judgment.

### B.     *Vantage Learning Is Not a Proper Defendant*

Defendants also assert in a conclusory fashion that Vantage Learning should be dismissed as a Defendant in this case.  (Doc. No. 63 at p. 9 ("Further, the Plaintiff did not apply for a job with Vantage Learning (USA), LLC and it is an improper Defendant in this litigation.  There is no basis for the action against Vantage Learning and the claims against it should be summarily dismissed."); *see also id.* at p. 16.)  However, the Court finds that Gavurnik has failed to show that a genuine issue of material fact exists as to whether he applied for a position with Vantage Learning.  The application he filled out on March 23 states "Vantage Labs Application for Employment" at the top of the page, and every page thereafter has a "VANTAGE LABS LLC" header.  (*See* Doc. No. 63-10.)  In addition, Gavurnik represented that he became aware of the position via a "job posting" (*see id.* at p. 1) and the job posting states, "Vantage Labs is seeking an experienced Maintenance Technician" (*see* Doc. No. 63-8).  Further, the language Gavurnik quotes from the last page of the job application does not support his argument that he applied for a job at Vantage Learning.  (*See* Doc. No. 64 at p. 14.)  The last page of the application is a waiver form, which bears the "VANTAGE LABS LLC" header and the top of the page states, "Vantage Labs Application Form Waiver."  (*See* Doc. No. 63-10 at p. 8.)  The first line of the job application states, "In exchange for the consideration of my job application by *Vantage Labs LLC* (and the Vantage Family of companies including all affiliates, related entities, subsidiaries, holding companies or parent company."  (*Id.* (emphasis added).)  Contrary to Gavurnik's apparent belief (*see* Doc. No. 64 at p. 12), this does not show that he applied for a position with Vantage Learning.

Gavurnik's argument that he can show that Vantage Learning is a proper defendant in light of the language of *another candidate's* application is equally unavailing.  (*See* Doc. No. 64

at p. 15 ("The employment application that Chris Marshall filled out for the same position states that he was applying to 'Vantage Learning USA LLC (and the Vantage Family of companies . . .' These are two different application forms from two different entities for the same position.").) First, Marshall's application has other distinguishing features. (*See* Doc. No. 64-17 (bearing a "VANTAGE LEARNING" heading on each page and stating on the first page of the application "Vantage Learning – Application for Employment").) Second, the fact that *Marshall* applied for a maintenance technician position with Vantage Learning does not compel the conclusion that *Gavurnik* also applied for a maintenance technician position with Vantage Learning.

Because Gavurnik brings retaliatory failure-to-hire claims, it logically follows that he would have to had applied to work for a defendant in order to assert employment discrimination claims against that defendant. Ultimately, the record is clear that Gavurnik applied for a position with Vantage Labs. Because Gavurnik has failed to raise a genuine dispute of material fact as to whether he applied for a position with Vantage Learning, the Court dismisses Vantage Learning should be dismissed as a Defendant.

## IV.    Conclusion

For the foregoing reasons, the Court denies Defendants' motion for summary judgment but dismisses Vantage Learning as a Defendant.

An appropriate Order follows.

22